# THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF GEORGIA
# MACON DIVISION

| | |
|---|---|
| **ROBIN L. TODD,** : | |
| : | |
| **Plaintiff,** : | |
| : | |
| v. : | Civil Action |
| : | No. 5:08-cv-398 (CAR) |
| **MICHAEL J. ASTRUE,** : | |
| **COMMISSIONER OF** : | |
| **SOCIAL SECURITY,** : | |
| : | |
| **Defendant.** : | |
| : | |
| _____ : | |

## ORDER

In this case, Plaintiff appeals from the denial of her application for a period of disability, disability insurance, and Supplemental Security Income benefits by the Commissioner of Social Security. She has exhausted her administrative remedies, having submitted her application to an Administrative Law Judge ("ALJ") for hearing and to the Appeals Council for review. Her claim for benefits was denied at each level, and Plaintiff now seeks judicial review of the Commissioner's decision pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g). Upon review of the administrative record and the arguments of the parties, and for the reasons set forth below, the final decision of the Commissioner is hereby **AFFIRMED**.

**I.   Procedural Background**

In her application for benefits, Plaintiff stated that she had been unable to work since August 2, 2004, due to "anxiety, depression, and degenerative disk disease in [her] hip." R.477. After the initial denial of her application, Plaintiff sought review by an ALJ, and a hearing was conducted on February 6, 2007. Based on the hearing and a review of Plaintiff's medical records, the ALJ issued

1

a written decision on April 25, 2007. In his decision, the ALJ determined that Plaintiff had "the following severe impairments: bipolar disorder and lumbar disc bulge with facet arthropathy." R41. Despite these severe impairments, the ALJ found that Plaintiff retained the residual functional capacity to "perform work at the light exertional level . . . limited to simple one- to three-step work with no dealing with the general public." R42. With the assistance of testimony from a vocational expert, the ALJ then concluded that there were jobs existing in significant numbers in the national economy that Plaintiff could perform, given her age, education, work experience, and residual functional capacity. R47. The ALJ thus found that Plaintiff was capable of making a successful adjustment to other work and was not disabled. See 20 C.F.R. § 404.1520(a)(4)(v).

After her application was denied by the ALJ, Plaintiff submitted her claim to the Appeals Council. In support of her appeal, she submitted additional evidence that was not before the ALJ. This evidence consisted of mental health treatment records from Advantage Behavioral Health Center, dated March 16, 2007, through May 23, 2007, including a medical statement from a treating psychiatrist at Advantage, Dr. Hector Aviles, dated April 22, 2007. In the Notice of Appeals Council Action of September 16, 2008, the Appeals Council noted that it had considered this additional evidence but found that there was no reason to review the ALJ's decision. R9.

**II.    Issues for Judicial Review**

In the present action, Plaintiff contends that the ALJ's decision was not supported by substantial evidence because the ALJ improperly discounted or did not otherwise address evidence demonstrating that Plaintiff's psychiatric condition was more severe than the ALJ concluded.[1] By implication, Plaintiff also contends that the Appeals Council should have remanded the case to the

---

[1] Plaintiff does not contest the ALJ's findings as to her physical impairments.

ALJ so that he could consider the new evidence submitted in support of her appeal. The Court disagrees, and finds that the ALJ's decision was supported by substantial evidence in the record as a whole, including the additional evidence that was submitted to the Appeals Council. Because the new evidence did not significantly alter the balance of evidence that was before the ALJ, the Appeals Council had no obligation to remand the case to the ALJ for further consideration.

### A.     Standards for review of benefits decisions

Judicial review of the decisions of the Social Security Commissioner is narrow in scope. The factual determinations of the Commissioner are entitled to deference, and the Court may not decide the facts anew, make credibility determinations, or re-weigh the evidence. Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005). Instead, the Court may only review the record to determine whether the Commissioner's decision is based upon the appropriate legal principles and is supported by substantial evidence. Id.

With regard to findings of fact, the findings of the Commissioner (through the ALJ) are entitled to deference. Courts reviewing benefits decisions may not decide facts, reweigh evidence, or substitute their own judgment for the judgment of the ALJ. Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983). Credibility determinations are left to the Commissioner and not to the courts. Carnes v. Sullivan, 936 F.2d 1215, 1219 (11th Cir. 1991). It is also left to the ALJ to resolve conflicts in the evidence. Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir. 1986). The only question is whether the Commissioner's factual determinations are supported by "substantial evidence." Substantial evidence "is less than a preponderance, but rather such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Moore, 405 F.3d at 1211.

The ALJ's findings of law are not subject to the same deference. On judicial review, courts must determine whether the ALJ applied the correct legal standards in reaching the decision. Harrell

v. Harris, 610 F.2d 355, 359 (5th Cir. 1980). Courts must therefore consider any questions of law *de novo*, and "no . . . presumption of validity attaches to the [Commissioner's] conclusions of law, including determination of the proper standards to be applied in reviewing claims." Wiggins v. Schweiker, 679 F.2d 1387, 1389 (11th Cir. 1982).

### B. The findings of the ALJ

After a hearing and review of Plaintiff's records, the ALJ concluded that Plaintiff had the residual functional capacity to perform a significant range of jobs despite her documented impairments. The ALJ reached his conclusion by applying of the five-step sequential evaluation process that the Social Security Administration has prescribed for the evaluation of disability claims. See 20 C.F.R. §§ 404.1520(a) and 404.920(a); see also Moore, 405 F.3d at 1211. As is common in Social Security disability cases, Plaintiff's argument is focused on the fourth and fifth steps of the evaluation, which deal with the claimant's residual functional capacity and ability to make a transition to other work.

The findings of the ALJ at the first three steps of the evaluation are not in dispute. At the first step of the evaluation, the ALJ determined that Plaintiff was not engaging in any substantial gainful activity at the time.[2] At the second step, the ALJ determined that Plaintiff had medically determinable impairments that were "severe," in that these impairments significantly limited her ability to perform basic work activities. The severe impairments noted by the ALJ were bipolar disorder and lumbar disc bulge with facet arthropathy. At the third step of the evaluation, the ALJ found that the impairments did not meet or equal any of the listed impairments in Appendix 1 of the

---

[2] At the hearing, Plaintiff admitted that she had worked for International House of Pancakes and for BP Express Food after the alleged onset of her disability, between August 2004 and August 2005. The ALJ nevertheless found that this work did not constitute substantial gainful activity.

4

Social Security Regulations (20 C.F.R. Subpart P, Appendix 1). These findings are accepted by both parties.

The controversy in this case centers on the fourth and fifth steps of the review, in particular on the ALJ's findings as to Plaintiff's residual functional capacity. At the fourth step, the ALJ must make an assessment of the claimant's residual functional capacity and determine whether the claimant was able to do her past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). As to Plaintiff's residual functional capacity, the ALJ determined that Plaintiff's bipolar disorder would limit her to "simple one- to three-step work with no dealing with the general public." R42. The ALJ found that Plaintiff also had some physical limitations due to her lumbar disc bulge, and assessed her residual functional capacity as follows:

> After careful consideration of the entire record, the undersigned finds that the claimant retained the residual functional capacity to perform work at the light exertional level. She can lift and carry items weighing 20 pounds occasionally and 10 pounds frequently. Due to complaints of knee pain and limited mobility, she is limited to occasional climbing, balancing, kneeling, stooping, crouching, and crawling; and no work on ladders, ropes, scaffolds, or at unprotected heights. Due to her mental impairment, she is limited to simple one- to three-step work with no dealing with the general public. The claimant has no visual, communicative, or manipulative limitations.

Id. Based on this residual functional capacity determination, the ALJ found that Plaintiff was unable to perform her past relevant work. The ALJ noted that Plaintiff had prior work experience as a cashier, cook's helper, waitress, and fast food worker. Despite the testimony of a vocational expert that Plaintiff would be able to perform past relevant work as a cook's helper, the ALJ determined that all of these jobs could be classified as "medium in terms of exertion" and elected to proceed to the fifth step of the evaluation.

At the fifth step the ALJ assumed that Plaintiff was unable to perform her past relevant work and considered whether there were other jobs in the national economy that Plaintiff could perform,

5

given her residual functional capacity, age, work experience, and education. In making this decision, the ALJ relied largely on the opinions of a vocational expert. The vocational expert testified that jobs existed in the nationally economy that required light, unskilled work and limited contact with the general public. According to the vocational expert, Plaintiff should have been capable of performing the requirements of representative occupations such as Table Worker, Conveyor Line Bakery Worker, and Poultry Worker, as defined in the Dictionary of Occupational Titles. R47. The vocational expert further testified that such jobs existed in significant numbers in both the national and local economies. Relying on the vocational expert's testimony, the ALJ determined that Plaintiff was capable of making an adjustment to other work. The ALJ therefore decided that Plaintiff had "not been under a disability, as defined in the Social Security Act," from August 2, 2004, to April 25, 2007, the date of his decision, and Plaintiff's application for benefits was denied.

### C. The sufficiency of the evidence before the ALJ

The Court's review of the administrative record in this case confirms that there is substantial evidence to support the ALJ's finding that Plaintiff retained the capacity to work despite the significant limitations imposed by her mental impairments. Plaintiff's treatment records show that during most of the period in question she suffered mild to moderate depressive symptoms. The records also suggest that she experienced some mild to moderate paranoia that diminished her ability to interact with the general public. There are no medical records to show that her bipolar disorder ever affected her memory or reasoning. The records do indicate that Plaintiff's condition was aggravated during a particularly stressful period between August and November of 2006, but this temporary aggravation does not support a finding of permanent disability. Overall, the evidence is

sufficient to lead a reasonable person to conclude that Plaintiff was able to do the sort of light, low-skilled work the ALJ described in his residual functional capacity assessment.

The medical records in the administrative file do not indicate that Plaintiff sought any regular psychiatric or psychological care between August 2, 2004, and August 7, 2006. Most of the records for the first two years of Plaintiff's alleged disability are related to Plaintiff's physical complaints. There are records showing that Plaintiff sought treatment at River Edge Behavioral Health Center for several months in 1998, but those records are not relevant to Plaintiff's current application for benefits. Prior to August 2006, the medical records show that Plaintiff was taking Lexapro and Xanax for anxiety and depression. Plaintiff obtained her primary health care from the W. T. Anderson Health Center at the Medical Center of Central Georgia, where she sought treatment for various physical problems, including gastro-esophageal reflux, plantars fasciitis, chest pains, and digestive problems. It appears that the Lexapro was first prescribed by Dr. Lorraine Sumner, a physician at the Anderson clinic, on July 29, 2003, after Plaintiff complained of "mood swings." R236. There is no detailed diagnosis or description of her mental condition in the records from the Anderson clinic.

For the first two years of Plaintiff's alleged disability, the only detailed descriptions of her mental condition are found in reports prepared at the request of the Commissioner or other agencies in connection with Plaintiff's application for benefits. The administrative record includes a Residual Functional Capacity Assessment conducted by John Piat, Ph.D., on December 24, 2004, a Mental Status Evaluation conducted by psychologist Larmia Robbins-Brinson, Ph.D., on August 15, 2005, and a Psychiatric Review conducted by Linda O'Neil, Ph.D., on September 13, 2005. Of these three psychologists, it appears that only Dr. Robbins-Brinson personally examined Plaintiff. All three psychologists reached conclusions consistent with the findings of the ALJ.

Dr. Robbins-Brinson personally examined Plaintiff on August 15, 2005, at the request of the Georgia Department of Labor, Social Security Disability Adjudication Section. After her examination, Dr. Robbins-Brinson concluded that Plaintiff suffered from Adjustment Disorder with Mixed Anxiety and Depressed Mood. R243. In her Summary and Prognosis, Dr. Robbins-Brinson observed that Plaintiff's mental condition would not completely limit Plaintiff's ability to function and work. Dr. Robbins-Brinson concluded:

> Ms. Robin Lucille Todd is a 38-year-old divorced female who alleges impairment due to difficulties with her hip as well as depression and anxiety subsequent an abusive marriage. She displayed a good ability to function in relating to the examiner. She was forthcoming with information and cooperative throughout. Ms. Todd appears able to understand simple, complex, and detailed instructions based on her education and work history. The claimant may be impaired in her ability to carry out various instructions levels due to health concerns. The claimant's ability to get along with the public, supervisors, and/or co-workers appears to be within normal limits. Her ability to sustain focused attention would permit the timely completion of assigned tasks and to maintain production norms within her physical capabilities. It is believed the claimant would not decompensate under stressful conditions. The claimant reported suffering anxiety and depression as a result of abuse by her ex-husband. It is expected that the claimant's current compliance with prescribed medications may positively impact chances for recovery. The claimant is thought to be competent to manage disability funds, if awarded.

R243-44. Dr. Robbins-Brinson's conclusions are generally consistent with the ALJ's finding that Plaintiff had the capacity, despite her mental impairments, to do "simple one- to three-step work with no dealing with the general public." Her prognosis suggests, in fact, that Plaintiff's limitations were less severe than those determined by the ALJ, in that Plaintiff was "able to understand simple, complex, and detailed instructions based on her education and work history" and that Plaintiff's "ability to get along with the public, supervisors, and/or co-workers [appeared] to be within normal limits."

Dr. Piat's earlier Residual Functional Capacity Assessment similarly finds that Plaintiff's psychological impairments imposed only moderate limitations on Plaintiff's ability to function. The

8

record does not state whether Dr. Piat personally examined Plaintiff, but it appears that he did not. In his summary conclusions, Dr. Piat noted that Plaintiff was "moderately limited" in four out of twenty enumerated functional areas: ability to maintain concentration for extended periods; ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; ability to interact appropriately with the general public; and ability to accept instructions and respond appropriately to criticism from others. R195-96. In all other areas, Dr. Piat concluded that Plaintiff was "not significantly limited." In his handwritten notes, he observed that Plaintiff was able to recall and follow directions, but would have periodic difficulties sustaining concentration, persistence, and pace at stressful tasks. He also observed that she was not a good candidate for interaction with the general public, but could perform adequately at tasks not subject to a great deal of criticism or interpersonal stress. R197.

A follow-up review by Dr. Linda O'Neil on September 13, 2005, confirms Dr. Piat's conclusions. Dr. O'Neil concluded that Plaintiff had "mild" limitations in her activities of daily living, in social functioning, and in concentration, persistence, and pace. R259. Although the record is not explicit, it appears that Dr. O'Neil also did not conduct a personal examination of Plaintiff, but relied primarily on the report of Dr. Robbins-Brinson. The only detailed psychological examination of Plaintiff conducted before August 2006 is the examination of Dr. Robbins-Brinson.

Most of the records in the file related to Plaintiff's psychological condition come from a period between August 6, 2006 and January 18, 2007, when Plaintiff was being treated at River Edge Behavioral Health Center during a highly stressful time in her personal life. On August 6, 2006, Plaintiff presented at the emergency room at the Medical Center of Central Georgia, reporting that she was having increased depressive thoughts, insomnia, sleep disturbance, decreased

concentration, and thoughts of suicide without a definite plan. R380. The Medical Center referred her to River Edge. Plaintiff went to River Edge on August 7, 2006, and reported that she was feeling very depressed, anxious, and nervous. R317. She reported to Dr. Reddy that she was having suicidal thoughts that morning, including thoughts of jumping off a bridge and thoughts of drinking drain cleaner or rat poison. R318. Due to her suicidal ideation, Plaintiff was taken back to the Medical Center, where she was hospitalized for four days.

In the summer of 2006, prior to and following her hospitalization, Plaintiff experienced several difficult events in her personal life. Hospital records indicate that in June or July she had been incarcerated for several weeks for failure to pay child support. At the same time, one of her sons was incarcerated in a juvenile detention center on arson charges. When she reported to River Edge on August 7, Plaintiff reported having difficulties with her boyfriend.[3] Shortly after her discharge from the Medical Center, her boyfriend kicked her out of the house, and she was forced to seek housing assistance from the Salvation Army. While she was in the hospital, her brother told her that her mother had lung cancer. These difficult events likely aggravated her psychiatric condition.

Despite the heightened stresses of the summer, the medical records indicate that Plaintiff was able to return to her normal level of functioning within a short period of time. During Plaintiff's four-day hospitalization, the physicians at the Medical Center adjusted her medication. The hospital's discharge summary notes that the change in medication produced a marked improvement of symptoms:

---

[3] In 2005, Plaintiff was divorced from her husband of nineteen years. In the summer of 2006 she was living with another man.

10

> The patient was admitted to the psychiatry pavilion. She was placed on close observation and initiated on medications targeting affective symptoms. She was resume[d] on antidepressants with Lexapro initiated. Also, begun on Seroquel. With above medications, the patient was noted to report improvement of symptomology. Prior to release, she described feeling better. Her affect was more reactive with appropriate smile. She reported her mood was significantly improved and denied thoughts of suicide, death, or [dying]. She also denied thoughts of harming others and reported paranoia had resolved. During the hospitalization, she reported improvement with all symptoms and described prior to release of sleep, appetite, and energy were improving. She, of note during her hospitalization, was informed by her brother that her mother had lung cancer. She was noted to react appropriately to being given this information and denied flair of symptoms related to above. She described [appropriate] sadness related to the news that was reported, but otherwise was okay.

R373. The discharge summary goes on to observe that Plaintiff interacted appropriately with peers and staff, without signs or complaints of paranoia. After her discharge, Plaintiff was instructed to continue her medication and to report regularly to River Edge for treatment and counseling.

The records of Plaintiff's treatment at River Edge between August 2006 and January 2007 also suggest that Plaintiff returned to her usual state of mild to moderate depression soon after her hospitalization. Plaintiff's treatment at River Edge was supervised by Dr. Foster Brin, a psychiatrist. The treatment records include Dr. Brin's notes from eight visits by Plaintiff between September 2006 and February 2007. These treatment notes show that Plaintiff's condition ranged from mild depression to no depressive symptoms. On each visit except one, Dr. Brin assigned Plaintiff a Global Assessment of Functioning (GAF) score of 45. On January 18, 2007, Dr. Brin assigned a GAF of 50 and transferred Plaintiff to a "Medication Management" schedule. On February 26, 2007, Plaintiff was discharged from treatment at River Edge.

The first notes from Dr. Brin are for a visit on September 11, 2006, approximately one month after Plaintiff was discharged from the Medical Center. On the September 11 visit, Dr. Brin observed that Plaintiff's affect and mood were "mildly depressed." R310. He noted that Plaintiff

11

had reported that she had been ill and experiencing difficulties with her brother and sister-in-law. Id. He also noted that Plaintiff reported some insomnia.

Plaintiff next met with Dr. Brin on September 14, 2006. Dr. Brin observed that Plaintiff's affect, mood, thought process, orientation, and behavior were "unremarkable." R451. He reported that Plaintiff was sleeping well at night, had a good appetite, and displayed a "euthymic" mood. Id. He noted that she complained of being sleepy during the day, and decreased her dosage of Seroquel. Id.

Plaintiff met with Dr. Brin again on September 25. He observed that her affect and mood were depressed. R438. Plaintiff reported feeling tired and having difficulty sleeping due to troubles with her ex-boyfriend. Id.

A week later, on October 3, Dr. Brin observed that Plaintiff's affect, mood, thought process, orientation, and behavior were "unremarkable." R432. He noted that Plaintiff still reported being tired, but was sleeping well, had a fair appetite, and showed a euthymic mood. Id. Plaintiff also denied "recent [illegible] depressive moods." Id.

The records indicate that Plaintiff did not meet with Dr. Brin again until a month later, on November 1. Plaintiff explained to the nurse that she had not been attending her group therapy meetings because her mother was in the hospital. R422. Dr. Brin observed that Plaintiff's mood and affect were depressed. R423. Plaintiff reported "feeling depressed due to mother sick at ICU and feeling too much stress." Id. Plaintiff also reported sleeping "fairly well" and having a good appetite. Id.

Plaintiff returned to Dr. Brin on November 27, 2006. Dr. Brin noted that Plaintiff's mother had died a week earlier. R407. He observed that her affect and mood were depressed and noted that her sleeping was impaired and her appetite fair. Id.

12

Seven weeks later, on January 18, 2007, Dr. Brin observed that Plaintiff was doing much better. He noted: "On follow-up today at PSR no complaint. Mood euthymic. Denies recent manic depressed moods, suicidal homicidal ideation. Sleeps well at night with good appetite." R405. Plaintiff requested to transfer from her group therapy treatment to a medication management program. Id. Dr. Brin agreed and directed her to return to him for a follow-up in 30 days.

At her follow-up, on February 8, 2007, Dr. Brin again observed that Plaintiff's affect, mood, thought process, orientation, and behavior were "unremarkable." R518. He observed a euthymic mood and noted that Plaintiff was sleeping well at night, though she continued to report being tired. Id. He also noted that Plaintiff reported "a lot of mood swings." Id.

On February 26, 2007, Plaintiff discontinued her treatment and requested a discharge from River Edge due to a relocation to Athens, Georgia. R415. While in Athens, Plaintiff sought care at Advantage Behavioral Care. Several months after the ALJ's decision in April 2007, Plaintiff submitted additional evidence to the Appeals Council, including records from Advantage in Athens and records from Plaintiff's return to River Edge in December 2007.

The records from Advantage are sparse. The records show that Plaintiff's first visit was on March 16, 2007, at which time she stated, "If I can get my meds then I will do just fine." R20. She appeared on April 25, 2007, when she complained of increased anxiety because she had been off her medication. R26. She returned the next day to obtain medication samples. R25. Plaintiff visited again on May 21, 2007, when she complained that one of her medications, Geodon, caused her nausea. R24. There are no records of any other visits to Advantage Behavioral Health.

The later records from Plaintiff's return to Macon show that Plaintiff was seen at River Edge by Dr. Reddy on two occasions, December 6, 2007, and January 11, 2008. On December 6, Plaintiff complained of racing thoughts, screams in her sleep, difficulty sleeping, and some obsessive

13

behaviors. R537.  Plaintiff indicated to the nurse that she had run out of medication. R536.  Dr. Reddy assessed her with a GAF of 48.  R537.  When Plaintiff returned on January 11, Dr. Reddy noted an inappropriate affect, mood swings, and racing thoughts.  R530.

The clinical notes from Plaintiff's treatment at the Medical Center, River Edge, and Advantage provide substantial evidence to support the Residual Functional Capacity assessment of the ALJ.  These records, viewed as a whole, including the new records submitted to the Appeals Council, support a reasonable conclusion that Plaintiff had mild and occasionally moderate depression, controlled by medication.  They further support a finding that Plaintiff's psychiatric condition was a "severe" impairment that limited her to performing light, low-skilled work with minimal contact with the general public.

The ALJ did not err in discounting the conclusory opinions of Dr. Brin and Dr. Aviles regarding Plaintiff's ability to work.   An ALJ is obligated to give substantial weight to the opinions of treating physicians, unless there is good cause to give such opinions less weight.  Lewis v. Callahan 125 F.3d 1436, 1440 (11th Cir. 1997).  Courts have found good cause to give less weight "where the doctors' opinions were conclusory or inconsistent with their own medical records." Id. The opinions of Dr. Brin and Dr. Aviles are both conclusory and unsupported by their own clinical records. On September 11, 2006, a month after Plaintiff was hospitalized at the Medical Center, Dr. Brin completed a Medical Statement on which he checked a box showing that Plaintiff was not presently able to work and on which he wrote that her prognosis and predicted return to work were "undetermined at this time."  R337.  On April or September 22, 2007, Dr. Hector Aviles of Advantage Behavioral Health filled out a similar form, on which he checked a blank indicating that Plaintiff was unable to work full-time and on which he indicated that Plaintiff's return to work was

undetermined.  R528.  There are no other notes from Dr. Aviles to show the basis for his conclusions.

The notes from Dr. Brin, discussed in detail above, do not show that plaintiff was suffering from disabling depression.  On September 11, 2006, the date Dr. Brin completed his Medical Statement, his clinical notes showed that Plaintiff was mildly depressed.  R310.  On September 14, October 3, January 18, and February 8, he observed that Plaintiff's mood was "euthymic."  R451, 432, 405, 518.  He observed more heightened depression only September 25, November 1, and November 27.  R438, 423, 407.

Plaintiff contends that the ALJ erred in failing to consider Dr. Brin's GAF scores.  Although the Court agrees that the ALJ should have explicitly addressed the GAF scores in his order, the GAF scores do not substantially change his findings.  Although a GAF score of 45 indicates a "serious impairment in social, occupational, or school functioning" (See DSM-IV, p. 32), such scores are not inconsistent with the findings of the ALJ, who determined that Plaintiff's psychological impairment was "severe."  GAF scores between 45 and 50 do not necessarily preclude a claimant "from having the mental capacity to hold at least some jobs in the national economy."  Smith v. Comm'r Soc. Sec., 482 F.3d 873, 877 (6th Cir. 2007).  See also Wisner v. Astrue, 496 F.Supp.2d 1299, 1304-05 (N.D.Ala. 2007)(listing cases finding that "a GAF score of 50 or below is not in and [of] itself determinative of disability").  The specific findings and observations in Dr. Brin's clinical notes support the ALJ's conclusion, and indicate that Plaintiff generally experienced mild depressive symptoms, with occasional aggravation to moderate depression or anxiety.

Moreover, the GAF findings of Dr. Brin relate to a period of only six months, a period that was unusually stressful.  To obtain Social Security disability benefits, a claimant must show an impairment "which has lasted or can be expected to last for a continuous period of not less than

15

twelve months." 20 C.F.R. §§ 404.1505(a), 416.905(a). In this case, the records prior to August 2006 and after February 2007 do not indicate a level of depression as severe as Plaintiff experienced surrounding the time of her incarceration and the death of her mother.

As the ALJ observed, the records for the fall and winter of 2006-2007 indicate that Plaintiff's "depressive symptoms were situational as they [were] often exacerbated by such stressors as family disputes, unresolved grief, an abusive marriage, her son's arrest, and her impending divorce." R45. On September 25, 2006, Plaintiff reported that she was distressed by troubles with her ex-boyfriend, who had recently kicked her out of his house. In November, Plaintiff was dealing with the death of her mother. Such events would be likely to cause depressive symptoms in any person. A temporary aggravation of symptoms, however, is not sufficient to establish disability as defined in the regulations, which require a claimant to show a "medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than twelve months." 20 C.F.R. § 404.1505(a).

The records on which Plaintiff focuses in her briefs focus on a period of approximately six months, between August 2006 and February 2007. This period was a time of particular stress for Plaintiff. As noted, there are no records of psychiatric or psychological treatment for the two years prior to August 2006, except for the prescription of medication. The records after February 2007 are sparse. Even the records for the period of more intensive treatment in late 2006 are generally consistent with the findings of the Administrative Law Judge.

**III.    Conclusion**

The Court's review of the record as a whole confirms that the ALJ's decision was supported by substantial evidence. The examination of Dr. Robbins-Brinson, the consulting opinions of Dr. Piat and Dr. O'Neal, and the treatment notes of Dr. Brin all support a finding that Plaintiff had the

Residual Functional Capacity to perform light, low-skilled work, "limited to simple one- to three-step work with no dealing with the general public." It is not contested in this proceeding that there are jobs that exist in the national economy that a person with a similar capacity can perform. Accordingly, the decision of the Commissioner is hereby **AFFIRMED**.

It is SO ORDERED this 26th day of March, 2010.

                                             S/ C. Ashley Royal
                                             C. ASHLEY ROYAL, JUDGE
                                             UNITED STATES DISTRICT COURT

chw